1  Elise R. Sanguinetti (SBN 191389)
2  Jamie G. Goldstein (SBN 302479)
   **ARIAS, SANGUINETTI, WANG & TORRIJOS, LLP**
3  2200 Powell Street, Suite 740
   Emeryville, California 94608
4  Telephone:     (510) 629-4877
   Facsimile:     (510) 291-9742
5  elise@aswtlawyers.com
   jamie@aswtlawyers.com
6

7  Attorneys for Plaintiffs

8

9                     UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11

12  TIFFANY MASTERSON, individually and as       CASE NO.
    Successor in Interest of the Estate of Logan
13  Masterson, CHRISTY MEDINA as Guardian ad
    Litem for Minor Plaintiff BENTLEY           **COMPLAINT FOR DAMAGES**
14  MASTERSON, SUZETTE SMITH as Guardian
    ad Litem for Minor Plaintiff BELLA           1.   Failure to Provide Medical Care
15  MASTERSON, CHRISTY MASTERSON as                   in Violation of Fourteenth
    Guardian ad Litem for Minor Plaintiffs            Amendment;
16  HAILEY MASTERSON and CHLOE               2.   Failure to Protect from Harm in
    MASTERSON,                                        Violation of Fourteenth
17                                                     Amendment;
18        Plaintiffs,                          3.   Deprivation of Substantive Due
                                                    Process in Violation of First and
19        vs.                                        Fourteenth Amendments;
                                               4.   Medical Malpractice;
20  COUNTY OF ALAMEDA, GREGORY J.             5.   Failure to Furnish Medical Care;
    AHERN, in his individual and official capacity, 6.   Negligent Supervision,
21  DEPUTY NICHOLAS LAGORIO, SERGEANT              Training, Hiring, and Retention;
    JOSHUA PAPE, CAROL BURTON in her         7.   Wrongful Death;
22  individual and official capacity as Interim    8.   Negligence.
    Director of the Alameda County Behavioral
23  Health Services Agency, KIM CURTIS, LCSW,   **[JURY TRIAL DEMANDED]**
    HAYLEY HOLLAND, AMFT, BOBBIE
24  COOK, MFT, CALIFORNIA FORENSIC
    MEDICAL GROUP, SAVITHA QUADROS,
25  RN, JANE MWANGI, RN, MELYNDA
    LOGAN, RN and DOES 1-20,
26
27        Defendants.
28

Page 1

**COMPLAINT**

**INTRODUCTION**

1.     This matter arises from the hanging death of Logan Masterson on April 8, 2018. Mr. Masterson was arrested on April 4, 2018 related to various charges. Mr. Masterson was brought to the Santa Rita Jail, where medical staff and jail staff were aware that Mr. Masterson suffered from substance abuse/addiction and psychological ailments. Mr. Masterson was initially placed in a safety cell on suicide watch, however, the suicide watch was discontinued, and he was moved to an isolation cell. Despite Mr. Masterson's pleas for help, and known psychological ailments, Mr. Masterson remained in the isolation cell without proper medical attention until he died two days later on April 8, 2018.

2.     Masterson's wife TIFFANY MASTERSON, individually and as Successor in Interest of the Estate of Logan Masterson, and Mr. Masterson's minor children BENTLEY MASTERSON, BELLA MASTERSON, HAILEY MASTERSON and CHLOE MASTERSON, through their respective Guardians ad litem, bring this action for damages against Defendants for civil rights violations, deliberate indifference, medical malpractice, wrongful death and negligence arising out of Defendants' deliberate indifference and negligence that caused the needless suffering and death of Logan Masterson and the losses to Mr. Masterson's wife Tiffany Masterson and his four children, Bentley Masterson, Bella Masterson, Hailey Masterson and Chole Masterson.

**JURISDICTION AND VENUE**

3.     This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983 and 1988, and for violations of California state law.

4.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

5.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

6.     Plaintiffs' claims arose in the County of Alameda, State of California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

**COMPLAINT**

7.     Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorizes assignment to this division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred Alameda County, which is served by this division.

**PARTIES**

8.     Plaintiff TIFFANY MASTERSON at all times mentioned herein was married to Decedent Logan Masterson and residing in San Joaquin County, State of California.

9.     At the time of death, Logan Masterson was a citizen of the United States of America and a resident of San Joaquin County, State of California.

10.     Plaintiff TIFFANY MASTERSON brings this action individually and as Successor in Interest of the Estate of Logan Masterson pursuant to California Code of Civil Procedure §§ 377.10, *et. seq*.

11.     Plaintiff TIFFANY MASTERSON, wife of Logan Masterson, brings these claims individually for violations of civil rights under the First and Fourteenth Amendments and California State law.

12.     Minor Plaintiffs BENTLEY MASTERSON, BELLA MASTERSON, HAILEY MASTERSON and CHLOE MASTERSON were the biological children of Logan Masterson. Logan Masterson had not fathered or adopted any other children prior to his death.

13.     Plaintiff BENTLEY MASTERSON brings this Complaint through his Guardian ad Litem Christy Medina.

14.     Plaintiff BELLA MASTERSON brings this Complaint through her Guardian ad Litem Suzette Smith.

15.     Plaintiffs HAILEY MASTERSON and CHLOE MASTERSON bring this Complaint through their Guardian ad Litem Christy Masterson.

16.     Defendant COUNTY OF ALAMEDA (the "County" or "Alameda County") is a public entity, duly organized and existing under the laws of the State of California. Defendant Alameda County operates and manages the County Jails including, Santa Rita Jail, through the County's management and operation of the Alameda County Sheriff's Office ("Sheriff's Office"), and Alameda County Behavioral Health Care Services ("BHCS"). Defendant Alameda County is, and

was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices, and customs of the Sheriff's Office and BHCS, and their respective employees and/or agents. The County is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that individuals are not at risk of serious harm and to ensure they receive adequate medical care. The County is also responsible for ensuring that jail policies and practices do not violate prisoners' constitutional rights. The County by law possesses ultimate authority over and responsibility for the mental health care, treatment, and safekeeping of inmates including decedent, Logan Masterson.

17.     Defendant GREGORY J. AHERN ("AHERN") is and was at all times mentioned herein the elected Sheriff of the County of Alameda. As Sheriff, Defendant Ahern is and was responsible for hiring, screening, training, retention, supervision, discipline, counseling and control of all Alameda Sheriff's Department custodial employees and/or agents. Defendant Ahern is and was charged by law with the administration of the Santa Rita Jail, with the assistance of a small group of executive officers. Defendant Ahern also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Alameda County Sheriff's Department alleged herein were committed. Defendant Ahern is being sued in his individual and official capacities.

18.     Defendant DEPUTY NICHOLAS LAGORIO ("Lagorio") is and was at all times mentioned herein a deputy officer and employee of Defendant Alameda County and in doing the acts described herein, acted within the course and scope of his employment.

19.     Defendant SERGEANT JOSHUA PAPE ("Pape") is and was at al times mentioned herein a sergeant and employee of Defendant Alameda County and in doing the acts described herein, acted within the course and scope of his employment.

20.     Defendants LAGORIO and PAPE are hereinafter collectively referred to as "ALAMEDA OFFICERS".

21.     DEFENDANT CAROL BURTON ("BURTON") is the Interim Director of the Alameda County Behavioral Health Care Services Agency. As Interim Director, BURTON is and was responsible for the provision of mental health care in the Alameda County Jails, including Santa

Rita Jail. As Interim Director, Defendant Burton is and was responsible for hiring, screening, training, retention, supervision, discipline, counseling and control of all BHCS employees and/or agents working at the Santa Rita Jail. Defendant Burton was also responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of BHCS alleged herein were committed. BURTON is being sued in her individual and official capacities.

22.    Defendant KIM CURTIS, LCSW ("CURTIS") is and was at all times mentioned herein a licensed clinical social worker and an employee and/or agent of BHCS and the COUNTY and in doing the acts hereinafter described, acted within the course and scope of her employment and/or agency.

23.    Defendant HAYLEY HOLLAND, AMFT ("HOLLAND") is and was at all times mentioned herein a licensed marriage and family therapist and an employee and/or agent of BHCS and the COUNTY and in doing the acts hereinafter described, acted within the course and scope of her employment and/or agency.

24.    Defendant BOBBIE COOK, MFT ("COOK") is and was at all times mentioned herein a licensed marriage and family therapist and an employee and/or agent of BHCS and the COUNTY and in doing the acts hereinafter described, acted within the course and scope of her employment and/or agency.

25.    Defendants CURTIS, HOLLAND and COOK are hereinafter collectively referred to as "BHCS PROVIDERS".

26.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP ("CFMG") is a California corporation headquartered in Monterey, California. CFMG is a private correctional health care provider that services approximately 65 correctional facilities in 27 California counties.

27.    The County of Alameda contracts with CFMG to provide medical, mental health, and dental services for the Santa Rita Jail. At all relevant times mentioned herein, CFMG was responsible for the health services provided to Logan Masterson during his detention in the Santa Rita Jail.

**COMPLAINT**

28.     Defendant SAVITHA QUADROS, RN, ("QUADROS") is and was at all times mentioned herein a registered nurse and an employee and/or agent of CFMG and in doing the acts hereinafter described, acted within the course and scope of her employment and/or agency.

29.     Defendant JANE MWANGI, RN, ("MWANGI") is and was at all times mentioned herein a registered nurse and an employee and/or agent of CFMG and in doing the acts hereinafter described, acted within the course and scope of her employment and/or agency.

30.     Defendant MELYNDA LOGAN, RN, ("LOGAN") is and was at all times mentioned herein a registered nurse and an employee and/or agent of CFMG and in doing the acts hereinafter described, acted within the course and scope of her employment and/or agency.

31.     Defendants QUADROS, MWANGI and LOGAN are hereinafter collectively referred to as "CFMG PROVIDERS".

32.     The true names and identities of Defendants Does 1 through 10 are presently unknown to Plaintiffs. Plaintiffs allege that each of Defendants Does 1 through 10 were employed by or agents of the County of Alameda and/or the Alameda County Sheriff's Department and/or BHCS at the time of the conduct alleged herein. Plaintiffs allege that each of Defendants Does 1 through 10 were deliberately indifferent to Logan Masterson's medical needs and safety, failed to provide necessary medical or psychiatric care to him or take other measures to prevent him from attempting suicide, violated his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other defendants to engage in such conduct. Plaintiffs further allege that Defendants Does 1 through 10 violated Plaintiffs' First and Fourteenth Amendment rights and rights under California state law. Plaintiffs further allege that each of Defendants Does 1 through 10 was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of medical, mental health, and jail custody employees and/or agents involved in the conduct alleges herein.

33.     The true names and identities of Defendants Does 11 through 20 are presently unknown to Plaintiffs. Plaintiffs allege that each of Defendants Does 11 through 20 were employed by or agents of California Forensic Medical Group at the time of the conduct alleged herein. Plaintiffs allege that each of Defendants Does 11 through 20 were deliberately indifferent to Logan

Masterson's medical needs and safety, failed to provide necessary medical or psychiatric care to him or take other measures to prevent him from attempting suicide, violated his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other defendants to engage in such conduct. Plaintiffs further allege that Defendants Does 11 through 20 violated Plaintiffs' First and Fourteenth Amendment rights, and rights under California state law. Plaintiffs further allege that each of Defendants Does 11 through 20 was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of medical, mental health, and jail custody employees and/or agents involved in the conduct alleged herein.

34.     Plaintiffs will seek to amend this Complaint as soon as the true names and identities of Defendants Does 1 through 20 have been ascertained.

35.     Defendants County, Ahern, Burton, Alameda Officers, BHCS Providers and Does 1 through 10 engaged in the acts or omissions alleged herein under color of state law.

36.     Plaintiffs are informed and believe and thereon allege that at all times mentioned in this Complaint, Defendants were the agents, employees, servants, joint venturers, partners and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

**EXHAUSTION OF PRE-SUIT PROCEDURES**

**FOR STATE LAW CLAIMS**

37.     Plaintiffs, with the exception of Bella Masterson, filed governmental tort claims with the County of Alameda on September 10, 2018. By correspondence dated September 28, 2019, the County of Alameda rejected the governmental tort claims on behalf of Plaintiffs.

38.     Plaintiff Bella Masterson served an application for relief from a late claim with the County dated March 27, 2019, and to date no response has been received.

39.     By correspondence dated March 25, 2019, Plaintiffs notified Defendants County of Alameda, Ahern, Burton, BHCS Providers, CFMG, and CFMG Providers of their intention to file suit against them based on their negligence in providing professional health care services, as required by Section 364 of the California Code of Civil Procedure.

**COMPLAINT**

## FACTUAL ALLEGATIONS

40.    Defendant County of Alameda, Ahern and Burton operate and control two Jail facilities in Alameda County, Glenn Dyer Detention Facility ("Glenn Dyer") in Oakland, California and Santa Rita Jail ("Santa Rita") in Dublin California, (collectively, the "Jails").

41.    Glenn Dyer is a 20-level, 234,000 square foot, maximum-security lock-up. The facility provides booking, intake and custodial services for all of Alameda County. Glenn Dyer also houses federal prisoners under a contract with the U.S. Marshall Service.

42.    Santa Rita is considered a "mega-jail" and ranks as the third largest facility in California and the fifth largest in the nation. Santa Rita houses detainees who are either awaiting adjudication of their pending criminal matters or serving a sentence determined by the court.

**Improper Use of Isolation**

43.    Defendants are deliberately indifferent to the substantial and obvious risk of harm caused by Defendants' policies and practices of locking prisoners in isolation, including prisoners with psychiatric disabilities, for prolonged periods of time. Over the last several decades, mental health and correctional experts have documented the harmful effects of prolonged isolation. Common side effects of prolonged isolation include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors. Due to these side effects, prolonged isolation is known to worsen existing psychiatric disabilities and can cause prisoners without pre-existing psychiatric disabilities to develop them.

44.    Placement in isolation imposes an atypical and significant hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process. Defendants fail to provide process adequate to protect that liberty interest. Despite the harmful and punitive conditions in these units, Defendants lack an effective, accurate classification system to determine who gets placed in isolation. Prisoners are placed in isolation indefinitely, with some individuals held in isolation for

years while they resolve pending criminal cases. Defendants offer prisoners no meaningful way to challenge their placement in isolation, despite purporting to conduct regular review of these placements.

45.    Defendants use multiple terms to refer to isolation including Administrative Isolation, Disciplinary Isolation, and Temporary Isolation. Defendants also use the term "Special Cells" to refer to isolation cells and safety cells. Individuals housed in these areas are referred to as "Special Management Inmates." Class I Special Management Inmates are defined to include all prisoners in Administrative Isolation, Disciplinary Isolation, Temporary Isolation, Protective Custody, all prisoners assigned to the Behavioral Health units and all prisoners in isolation cells. Class II Special Management Inmates are defined as individuals on IOL status. Housing Units may also have isolation cells specific to those units. Plaintiffs refer to all of the above housing statuses, collectively, as "isolation."

46.    Approximately 10% of all prisoners at Santa Rita are housed in what is known as Administrative Isolation. Prisoners on Administrative Isolation are housed alone in a cell and are only permitted to go outside of their cell alone for extremely limited periods of time, further depriving them of any social interactions.

47.    Defendants use isolation as a form of punishment, including for behaviors that are related to an individual's psychiatric disabilities. Disciplinary Isolation is defined in Defendants' policies as "punitive segregation from the general jail population and restricted privileges for an inmate who has committed a serious rule violation." Individuals in Disciplinary Isolation are permitted to leave their cells for up to one hour a day, five days a week. There is no cap on the use of Disciplinary Isolation and prisoners may be held in Disciplinary Isolation for more than 30 days, even for a single rule violation, where authorized by the Commanding Officer at the Jails.

48.    Defendants control housing assignments and house prisoners in isolation in various housing units in the jails, including, men's Housing Unit 02, for 22 or 23 hours or more per day. Prisoners housed in Administrative Segregation, including those with serious psychiatric disabilities, are sometimes kept in their cells between 23 and 24 hours per day,

sometimes only being let out of their cells to use the dayroom for one hour every other day. In these units, this scant dayroom time is the only chance people have to shower, make phone calls, or order commissary. All of the beds in these units are located in locked cells and prisoners are typically required to eat meals in their cells as well.

49.     Prisoners held in Administrative Segregation units are typically locked in single-occupancy cells and cannot have conversations with other individuals unless they speak into the vents in their cells, or shout loudly enough for people to hear through the cell walls and doors.

50.     Defendants do not conduct meaningful or effective review of isolation placements and do not provide prisoners with meaningful methods to understand why they have been placed in isolation and how they can be removed from isolation.

51.     Prolonged isolation is harmful to all prisoners, but it is particularly harmful for prisoners with psychiatric disabilities. Defendants have not modified their policies and procedures to accommodate people with such disabilities so that they do not suffer harm, and worsening of their pre-existing disabilities, from isolation.

52.     Defendants have a policy of locking prisoners with psychiatric disabilities in highly restrictive isolation units because of their disabilities and without offering reasonable modifications that would permit them to be housed in less restrictive areas. As a result, Defendants deny prisoners with psychiatric disabilities with meaningful access to the Jails' programs, services, and activities. Per the Jails' policies, prisoners categorized as "mentally disordered" and prisoners on IOL for suicidal tendencies, bizarre behavior, psychotropic medication, or medical observation must be housed in special management units (which includes the Behavioral Health units), maximum security units, or in the Outpatient housing Unit – all of which are highly restrictive units that provide significantly reduced, or non-existent, access to educational and rehabilitative programming compared to that available to their non-disabled peers. Prisoners with psychiatric disabilities held in these units may receive as little as five hours of time outside of their cell per week, far less than their non-disabled peers.

53.    Defendants' disciplinary process fails to take into account behavior which results from psychiatric disabilities and the lack of adequate mental health care at the Jails. As a result, Defendants lock people with psychiatric disabilities in isolation, including in safety cells, for nonconforming and erratic behaviors related to their psychiatric disabilities without exploring whether less restrictive options or alternatives could resolve the behaviors. This policy and practice deprive inmates with psychiatric disabilities of access to the programs, services, and activities available in the less restrictive units. The restrictive conditions and lack of programming options in the Administrative Segregation and Behavioral Health Units serve only to worsen these disability-related behaviors. Instead of providing treatment, however, Defendants respond by locking prisoners in isolation for even longer periods of time.

54.    Defendants also fail to monitor prisoners with and without psychiatric disabilities or provide sufficient mental health services to prisoners locked in isolation. This is despite the well-known medical and mental health dangers of locking people in their cells for prolonged periods of time.

55.    By policy, the County requires only five hours a week of out of cell time for prisoners housed in isolation. This is below any acceptable corrections standard including the standards set by the American Correctional Association which require that prisoners are provided with at least one hour a day outside of their cells. This level of isolation is harmful to the mental and physical health of any prisoner but is especially dangerous for prisoners with mental illness.

56.    Prisoners in the isolation units, including in Administrative Segregation and in the Behavioral Health units are rarely, if ever, permitted to go outside and are deprived of adequate opportunities to exercise. Exercise opportunities at the County Jails are well below all established detention standards. See Cal. Code Regs. tit. 15 § 1065 (requiring 3 hours of "exercise" per 7 days); Cal. Code Regs. tit. 15 § 1006 ("'Exercise' means physical exertion of large muscle groups."); Cal. Code Regs. tit. 24 § 1231.2.10 (defining exercise area minimum of at least one exercise area of not less than 600 sq. ft.).

COMPLAINT

57.     Adding to the harmful effects of isolation, lack of outdoor exercise, and lack of structured programming, conditions in the isolation units are deplorable. Some prisoners with inadequately treated mental illnesses smear themselves and the walls of their cell with excrement. The smell of feces pervades throughout the units. These unsanitary conditions are compounded by the failure to provide soap to prisoners who cannot afford to purchase soap, and by custody staff's failure to distribute adequate cleaning supplies to prisoners or provide sufficient time to allow prisoners to clean their cells. Defendants also serve prisoners bland and extremely repetitive meals with little nutritional value which are frequently contaminated with rocks, plastic, and rodent feces.

58.     The conditions in isolation significantly increase the risk that prisoners with psychiatric disabilities will have their condition decompensate when placed in isolation. A significantly disproportionate percentage of suicides occur in isolation units. Because of the risks posed by isolation to prisoners with psychiatric disabilities, a consensus has been reached in mental health correctional communities that prisoners with psychiatric disabilities should only be placed in isolation if absolutely necessary. In addition, if prisoners with mental illness are placed in isolation, there must be limits on the amount of time they remain in such units, they must be monitored closely, and they must be provided with significant structured and unstructured out-of-cell time.

59.     Defendants lack policies and practices to revaluate whether prisoners with mental illness placed in isolation should remain in isolation.

60.     Defendants' policy for conducting safety checks is inadequate to ensure the safety of prisoners with serious mental illness in Administrative Segregation units and in the Behavioral Health Units. Defendants have a policy requiring safety checks once every half hour in isolation units, but fail to follow this policy and frequently fail to conduct appropriate checks at intermittent and unpredictable times. Defendants' performance of safety checks is perfunctory and does not include direct visual observation that is sufficient to assess the prisoner's well-being and behavior. Defendants fail to utilize verbal interaction as a part of their safety checks even when visual observation of the subject prisoner is

obscured or circumstances otherwise demonstrate reason for concern about the prisoner's well-being and behavior. As a result, prisoners in isolation are placed at an increased risk of harm.

61.     Custody staff's failure to perform adequate welfare checks is exacerbated by severe understaffing of custody deputies at the Jails.

62.     Defendants' inadequate policies and procedures for monitoring prisoners in administrative isolation units, including prisoners with psychiatric disabilities placed Mr. Masterson at risk prior to his suicide and contributed to his suicide because Defendants failed to conduct meaningful safety checks.

63.     The cumulative effect of prolonged isolation, along with the denial of opportunities for vocational, recreational, educational, and religious programming, being housed in a small cramped and filthy cell have caused prisoners at the Jails, including prisoners with psychiatric disabilities, serious physical and psychological harm and puts them at substantial risk of significant harm.

**Failure to Provide Minimally Adequate Mental Health Care**

64.     Defendants failed to meet their constitutional obligation to provide adequate mental health care to prisoners in the Jails. Defendants are deliberately indifferent to the fact that their failure to provide adequate mental health care subjects prisoners to a substantial risk of deteriorating psychiatric conditions, extreme and unnecessary anguish, suffering and death. Defendants exacerbate the psychological trauma experienced by prisoners with serious mental health conditions who are housed in isolation, including in safety cells, by failing to provide them with necessary mental health care. As a result, their disabilities worsen and their disability-related behaviors escalate, causing them to be kept in isolation longer.

65.     Mental health care in the Jails is provided by or through Defendant Alameda County.

66.     Defendants control prisoners' access to mental health care professionals and medications, inside or outside of the Jails. Accordingly, prisoners cannot receive any mental health care services, including psychotropic medication, group and individual therapy, and suicide intervention, unless Defendants provide them.

67.     Defendants fail to adequately train custody and mental health and medical care staff on how to provide appropriate and timely mental health care. The lack of training is evident from the numerous incidents in which prisoners' health and lives have been, and continue to be, placed at risk as a result of the deficient mental health care provided in the Jails. As a result of a lack of adequate training, custody and health care staff fail to: (a) provide timely and appropriate mental health screening; (b) track and monitor prisoners with psychiatric disabilities; (c) properly administer and monitor psychotropic medications; (d) recognize and properly refer prisoners exhibiting signs and symptoms of psychiatric disabilities to mental health staff; (e) respond adequately to prisoners who are suicidal; (f) appropriately house prisoners with serious mental illness in the least restrictive setting appropriate to their needs; (g) properly respond to prisoners' requests for mental health care or provide appropriate follow-up care; (h) provide confidential spaces for mental health treatment; (i) maintain accurate and complete mental health records; and fail to (j) provide appropriate re-entry services for prisoners with psychiatric disabilities to allow them to properly continue their mental health care.

68.     Defendants' policies and practices for mental health screening and tracking are inadequate. Defendants fail to adequately identify, track, and treat the mental health problems of newly arriving prisoners with psychiatric disabilities during the screening and intake process. Defendants' failure to identify and initiate adequate mental health treatment via the Jails' intake process places prisoners arriving at the Jails with psychiatric disabilities at a significant risk of serious harm, including death.

69.     When a prisoner is newly booked into the Jail, the first step of the intake process involves custody or medical staff completing a brief one-page general health screening form, called a Medical Intake Triage/Receiving Screening form, through a cursory interview conducted with the prisoner in a non-confidential area of the Jail.  After the initial screening, newly booked prisoners are typically interviewed by a member of the medical staff. Mental health staff from BHCS play no role in this process.

70.     By custom and policy, there is poor coordination of care for prisoners with psychiatric disabilities. Upon information and belief, Defendants do not track the numbers of prisoners with psychiatric disabilities or their specific housing locations and/or disability-related needs.

71.     Upon information and belief, by custom and policy, neither medical nor corrections staff is adequately trained to recognize signs and symptoms of mental illness, and to refer prisoners who exhibit such signs and symptoms to mental health staff. As a result, staff fail to make appropriate referrals and prisoners who exhibit symptoms of mental illness are not timely treated.

72.     When prisoners interact with mental health clinicians, the encounters are superficial, and non-confidential. The encounters are also extremely brief, usually lasting only around five minutes. No therapy is provided. Clinicians typically ask little more than "are you suicidal?" and "have you been taking your medications?".

73.     Defendants fail to provide adequate and timely mental health care to prisoners who are experiencing psychiatric crisis.

74.     Defendants fail to timely respond to emergency calls for help from prisoners in crisis. While the cells at Santa Rita are equipped with call buttons, many are non-functional or go ignored by custody staff when activated by prisoners in crisis

75.     Defendants fail to identify, treat, track, and supervise prisoners who are at risk for suicide. Defendants' policies and practices for screening, supervising, and treating prisoners at risk for suicide are inadequate.

76.     These shortcomings in Defendants suicide prevention and treatment programs have had tragic consequences. According to figures maintained by the California Department of Justice, from 2014 to 2017 at least 30 individuals have died while incarcerated in the Jails. Of those deaths, 12 were classified as suicides. Since 2017, there has been at least one suicide and many more attempted suicides at the Jails. The rate of suicides at the Jail is nearly twice the national average for jail facilities.

**COMPLAINT**

77.     Upon information and belief, Defendants do not adequately train custody staff to identify prisoners who are at risk of suicide and respond appropriately to prisoners who are exhibiting suicidal tendencies, putting them at increased risk of harm. This is especially problematic because custody staff, both during the intake process and for the duration of a prisoner's time in the Jail, have the primary responsibility for alerting mental health staff when a prisoner is suicidal.

78.     Defendants routinely fail to identify and track prisoners who are at risk for suicide.

79.     Defendants routinely house suicidal and seriously mentally ill prisoners in conditions that result in further deterioration of their mental health in violation of standards of minimally adequate mental health care and basic human dignity. Rather than individually determining the least restrictive environment in which a suicidal prisoner can be safely housed, Defendants have a policy and practice of placing prisoners with serious psychiatric disabilities in safety cells. The safety cells are single cells with no furnishings, toilets, or (in most cases) windows for outside light. The only features of the cell are the door, which has a slot through which food can be delivered, and a grate in the floor that serves as the toilet. Without toilet paper in these cells, and no way to wash, feces makes its way across the cell, on the floors, and walls. When housing a prisoner in a safety cell, Defendants routinely remove all of the prisoner's clothing, leaving the prisoner naked in the room. In some instances, Defendants permit a prisoner to have a tear-proof smock to wear and nothing else. There is no mattress or pad, let alone a bed, in the safety cells for prisoners to sit or sleep on. Prisoners are thus forced to sit, sleep, and eat on the same cold, dirty floor on which the grate for the toilet is located. Defendants' improper use of safety cells places prisoners with psychiatric disabilities at an increased and unreasonable risk of harm.

80.     The safety cells are rarely cleaned when a prisoner is being housed in one of the cells and are not cleaned sufficiently once a prisoner is released from the cell. These conditions are traumatic for all prisoners, but especially for those who are already experiencing severe mental health symptoms. Suicidal prisoners perceive the safety cells as a method of punishment which dissuades them from telling staff they are suicidal.

81.     Defendants exacerbate the psychological trauma prisoners with psychiatric disabilities experience in isolation by failing to provide them with necessary mental health care while they are there. These prisoners do not receive sufficient contact with mental health providers (if they receive mental health care at all). And, the harsh conditions of their confinement render less effective the minimal treatment they do receive. As a result, they are put at an increased risk of harm because the conditions in isolation can cause their symptoms, including suicidality, to escalate and force them to stay in isolation even longer.

82.     Defendants fail to ensure by policy and practice that mental health care staff are consulted prior to placing a prisoner in a safety cell and before a prisoner is released from a safety cell.

83.     Defendants fail to adequately follow up with, monitor, and treat prisoners who have been released from safety cells, including Logan Masterson who committed suicide while housed in isolation in Housing Unit 02 fewer than 36 hours after being released from a safety cell, where he had been placed due to suicidality.

84.     Defendants have knowledge of the substantial risk of harm caused by inadequate suicide prevention and treatment policies and practices in the Jails, but have failed to take steps to prevent, or even to diminish, the harmful effects of these unlawful policies and practices. Defendants are thus deliberately indifferent to the risk of harm to prisoners created by their failure to operate a constitutionally adequate suicide prevention and treatment program.

85.     The Jail's low staffing levels result in mental health care staff being unable to timely respond to prisoners' requests for psychiatric evaluations and treatment, to adequately screen, track, monitor, and provide follow-up care to prisoners who are suffering from serious mental illnesses, and to provide adequate group and individual therapy.

86.     The Jail fails to staff sufficient deputies to enable prisoners to access mental health services and other programs available at the Jails.

**Logan Masterson**

87.     Logan Masterson arrived at the Santa Rita Jail on April 4, 2018. He was intoxicated and suicidal.

88.     Mr. Masterson was initially placed on suicide watch in a safety cell.

89.     The morning of April 6, 2018, Mr. Masterson was rehoused to Administrative Segregation in Housing Unit 02. The conditions in the isolation unit place Mr. Masterson at increased risk of harm, including suicide. Despite this, Mr. Masterson was housed alone in a single cell containing a bunk bed and hanging points.

90.     While held in the isolation cell, Mr. Masterson asked for mental health assistance, but no one responded.

91.     General observation checks were to be performed every half hour, however, the checks were not timely performed and when performed they were inadequate, including an obstructed view not allowing the deputy to properly visualize Mr. Masterson

92.     Less than two hours before his suicide, at about 2:45 PM, Mr. Masterson was observed engaging in strange behavior, flooding his cell by clogging the toilet and/or sink in his cell and causing water to pool inside his cell and leak out into the area surrounding his cell. At this time, Mr. Masterson had also partially covered the window into his cell with wet toilet paper. Custody officers observed this behavior, but did not contact mental health staff, intervene, or question Mr. Masterson about his mental state. Instead, custody staff simply ordered the water to be turned off in Mr. Masterson's cell.

93.     The last welfare check that was performed prior to Mr. Masterson's death was at 3:20pm and was dangerously cursory and superficial. Defendant Lagorio's view was obstructed and he was not at the cell when the check was performed. Defendant Lagorio was unable to determine what Mr. Masterson was doing at the time of the check. Despite having no clear view of Mr. Masterson, despite the horrific condition of Mr. Masterson's cell, despite Mr. Masterson's bizarre behavior including flooding his cell, and despite Mr. Masterson's having been on suicide watch fewer than 36 hours earlier, the Defendant Lagorio did not conduct a proper check.

94.      Over an hour then passed without any welfare check being performed on Mr. Masterson. At about 4:29 PM, Mr. Masterson was found dead in his cell. Mr. Masterson's body was still warm to the touch and was not stiff in any way.

**CLAIMS FOR RELIEF**

**First Claim for Relief**

**Deliberate Indifference to Serious Medical and Mental Health Needs in**

**Violation of the Fourteenth Amendment to the Constitution of the United**

**States (Survival Action – 42 U.S.C. § 1983)**

**(Against All Defendants)**

95.      Plaintiffs re-allege and incorporate by reference paragraphs 1 through 94 as though fully set forth herein.

96.      Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical and mental health issues.

97.      Defendants have consistently demonstrated deliberate indifference to their constitutional obligation to provide minimally adequate medical and mental health care to inmates in their jails. Defendants failure to correct their policies, procedures and practices, despite longstanding and repeated notice of significant and dangerous deficiencies, evidences deliberate indifference in the provision of medical and mental health treatment.

98.      Defendants were on notice that Mr. Masterson was in need of medical and mental health care based on his known history to Defendants and his behavior at the time of his arrest and through his death on April 8, 2018.

99.      Defendants failed to provide necessary medical and mental health evaluation and treatment to Mr. Masterson while he was in their custody despite his history of serious mental illness, obvious symptoms of a mental health crisis, and information that he was under the influence of narcotics.

**COMPLAINT**

100.    Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Masterson with appropriate medical or mental health care and to identify suicide risk, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to identify suicide risk and provide treatment, constituted deliberate indifference to Mr. Masterson's serious medical needs, health and safety.

101.    As a direct and proximate result of Defendants' conduct, Mr. Masterson experienced physical pain, severe emotional distress, and mental anguish as well as loss of his life and other damages alleged herein.

102.    As a result of the injuries to Mr. Masterson, Plaintiffs have been injured and are entitled to compensatory damages against all Defendants and punitive damages against all individual Defendants. Specifically, the aforementioned acts of Defendants were conducted with conscious disregard for the safety of Mr. Masterson and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

103.    Plaintiffs have sustained a loss of interest on the value of the damages from the date they were incurred to the present and said loss will continue into the future.

**Second Claim for Relief**

**Failure to Protect from Harm in Violation of the Fourteenth Amendment to**

**the Constitution of the United States (Survival Action – 42 U.S.C. § 1983)**

**(Against All Defendants)**

104.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 103 as though fully set forth herein.

105.    Each Defendant could have taken action to prevent unnecessary harm to Mr. Masterson but refused or failed to do so.

106.    Defendants failed to have minimally necessary policies and procedures concerning the adequate identification and housing of Mr. Masterson, whom they knew or should have known to be at risk of self-harm and failed to have minimally necessary policies and procedures concerning

the adequate treatment of Mr. Masterson who they knew or should have known was in need of medical and mental health attention due to risk of self-harm.

107.     Defendants failed to implement minimally sufficient policies and procedures to protect inmates from harm. Defendants failed to appropriately train and supervise staff regarding identification and handling of detainees at risk of harm. With respect to Mr. Masterson, Defendants failed to follow even their own suicide prevention procedures to identify, house, and monitor detainees at risk of self-harm.

108.     Defendants have consistently demonstrated deliberate indifference to their constitutional obligation to provide minimally adequate mental health and medical care to inmates in their jail. Defendants failure to correct their policies, procedures and practices, despite longstanding and repeated notice of significant and dangerous deficiencies, including multiple attempted and successful suicides, evidences deliberate indifference in the provision of mental health and medical treatment.

109.     Defendants were specifically on notice that Mr. Masterson was in need of mental health attention due to risk of harm based on his presentation at the time of his arrest as well as during his incarceration based on his behavior including verbalizing potential self-harm and requesting mental health services.

110.     Defendants were further on notice as Mr. Masterson as known to them along with his history of psychological ailments and suicide risk.

111.     Defendants failed to provide necessary mental health and medical treatment to Mr. Masterson while he was in their custody and care despite his obvious signs of distress.

112.     Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take appropriate measures to protect Mr. Masterson from harm, their failure to create minimally necessary policies and procedures ensuring proper housing for inmates in distress, including those that are at risk of harm or suicide, recognizing behavior associated with suicide risk and providing mental health care for inmates, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in

**COMPLAINT**

order to protect Mr. Masterson from harm, constituted deliberate indifference to Mr. Masterson's serious medical needs, health, and safety.

113.   As a direct and proximate result of Defendants' conduct, Mr. Masterson experienced physical pain, severe emotional distress, and mental anguish as well as loss of his life and other damages alleged herein.

114.   As a result of the injuries to Mr. Masterson, Plaintiffs have been injured and are entitled to compensatory damage, all according to proof at the time of trial.

115.   The aforementioned acts of the individual Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future, all according to proof at the time of trial.

116.   Plaintiffs have sustained a loss of interest on the value of all damages from the date they were incurred to the present and said loss will continue into the future.

**Third Claim for Relief**

**Deprivation of Substantive Due Process Rights in Violation of First and**

**Fourteenth Amendments to the Constitution of the United States – Loss of**

**Parent/Child Relationship (42 U.S.C. § 1983)**

**(Against All Defendants)**

117.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 116 as though fully set forth herein.

118.   The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Mr. Masterson's serious medical needs, health and safety, violating Mr. Masterson's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused the untimely and wrongful death of Mr. Masterson deprived Plaintiffs Bentley Masterson, Bella Masterson, Hailey Masterson and Chloe Masterson of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

119.    As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein including the loss of love, companionship, comfort, care assistance, protection, affection, society, moral support, training, guidance and gifts of Mr. Masterson, as well as the loss of value of Mr. Masterson's household services and financial support. Plaintiffs are further entitled to recover prejudgment interest.

120.    The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages against all individual Defendants to punish the wrongful conduct alleged herein and to deter such conduct in the future.

121.    Plaintiffs have sustained a loss of interest on the value of all damages from the date they were incurred to the present and said loss will continue into the future.

**Fourth Claim for Relief**

**Medical Malpractice (Survival Actions – California State Law)**

**(Against Defendants County, Carol Burton, BHCS Providers, CFMG, CFMG Providers and Does 1 through 20)**

122.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 121 as though fully set forth herein.

123.    Defendants County, Burton, BHCS Providers, CFMG, CFMG Providers and Does1 through 20, and each of them, failed to comply with professional standards in the treatment of Mr. Masterson's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, prematurely removing Masterson from suicide watch and returning him to an unsafe cell, failing to provide appropriate mental health treatment, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

124.    Defendants County, Burton, BHCS Providers, CFMG, CFMG Providers and Does 1 through 20, and each of them, also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Mr. Masterson, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

125.    As a direct and proximate cause of this negligence and failure to meet their professional standards of care, Plaintiffs suffered injuries and damages as alleged herein.

126.    The negligent conduct of these Defendants was committed within the course and scope of their employment.

127.    As a result of the injuries to Mr. Masterson, Plaintiffs have been injured and are entitled to compensatory damages against all Defendant and punitive damages as to the Individual Defendants, all according to proof at trial.

128.    The aforementioned acts of the individual Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

129.    Plaintiffs have sustained a loss of interest on the value of all damages from the date they were incurred to the present and said loss will continue into the future.

**Fifth Claim for Relief**

**Failure to Furnish / Summon Medical Care**

**(Survival Action – California State Law)**

**(Against All Defendants)**

130.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 129 as though fully set forth herein.

131.    Defendants owed Mr. Masterson a duty of care to provide him immediate medical and mental health care.

132.    The conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Logan Masterson was in need of immediate medical and mental health care and that Defendants failed to take reasonable action to summon or provide that care, resulting in Mr. Masterson's death as alleged herein, violated California state law, including Cal. Govt. Code §§ 844.6 and 845.6.

133.    Defendants also failed to evaluate, diagnose and treat Mr. Masterson's expressions of suicidal ideation and instead removed him from suicide watch, placed him into an isolation cell and ignored his bizarre behavior, the horrific conditions of his cell and his pleas for help from

**COMPLAINT**

1   mental health providers all before he ultimately hung himself in his cell. Moreover, Defendants
2   failed to conduct any mental health screenings, timely monitor Mr. Masterson or take any
3   measures to appropriately treat his mental illness and monitor his health.

4   134.    The alleged conduct of Defendants was committed within the course and scope of their
5   employment.

6   135.    As a direct and proximate result of Defendants' breach, Mr. Masterson and suffered
7   injuries and damages causing great pain and leading to his death, as alleged herein, and therefore,
8   Plaintiffs have suffered damages.

9   136.    The aforementioned acts of the individual Defendants were willful, wanton, malicious,
10   and oppressive, thereby justifying an award of exemplary and punitive damages, as to the
11   individual Defendants, to punish the wrongful conduct alleged herein and to deter such conduct in
12   the future.

13   137.    Plaintiffs have sustained a loss of interest on the value of all damages from the date they
14   were incurred to the present and said loss will continue into the future.

15                                   **Sixth Claim for Relief**

16              **Negligent Supervision, Training, Hiring, and Retention**

17                    **(Survival Action –California State Law)**

18   **(Against Defendants County of Alameda, Ahern, CFMG and Does 1 through 20)**

19   138.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 137, as though fully
20   set forth herein.

21   139.    Defendants County of Alameda, Ahern CFMG and Does 1 through 20 and each of them,
22   had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or
23   agents refrain from the conduct and/or omissions alleged herein.

24   140.    Defendants County of Alameda, Ahern CFMG and Does 1 through 20 and each of them,
25   breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring,
26   supervision, training, and retention under the laws of the State of California.

27

28

**COMPLAINT**

141.    As a direct and proximate result of Defendants County of Alameda, Ahern CFMG and Does 1 through 20 and each of them, Mr. Masterson endured pain, suffering, physical injury and emotional distress prior to his death as alleged herein.

142.    As a result of the injuries to Mr. Masterson, Plaintiffs have been injured and are entitled to compensatory damages against all Defendants and punitive damages as to the individual Defendants, all according to proof at the time of trial.

143.    Plaintiffs have sustained a loss of interest on the value of all damages from the date they were incurred to the present and said loss will continue in the future.

**Seventh Claim for Relief**

**Wrongful Death – California Code Civ. Proc. § 377.60**

**(Against All Defendants)**

144.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 143, as though fully set forth herein.

145.    Mr. Masterson's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants. Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiff' injuries and damages, as alleged herein.

146.    Defendants failed to provide the necessary mental health and medical care to Mr. Masterson despite him being a suicide risk, exhibiting bizarre behavior, horrific cell conditions and pleas for mental health assistance. Defendants further failed to provide adequate safety checks and kept Mr. Masterson in an isolated cell with hanging points and means to commit suicide, despite his mental state.

147.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiff incurred expenses for funeral and burial expenses in an amount to be proved.

148.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of the services, love, comfort, affection, society, guidance, care, and protection of the decedent, as well as the loss of the present value of his future services to his children. Plaintiffs are further entitled to recover prejudgment interest.

**COMPLAINT**

149.    Plaintiff Estate of Logan Masterson is entitled to recover punitive damages against individual Defendants who, with conscious disregard of Logan Masterson's rights, failed to provide Logan Masterson with mental health treatment services meeting the professional standard of practice and failed to adhere to the legal mandates of prisoner supervision.

150.    The aforementioned acts of the individual Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiff of exemplary and punitive damages, as to the individual Defendants, to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Eighth Claim for Relief**

**Negligence (Survival Actions – California State Law)**

**(Against All Defendants)**

151.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 150, as though fully set forth herein.

152.    The Defendants failed to comply with professional standards in the treatment of Logan Masterson's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, prematurely removing Logan Masterson from suicide watch and returning him to an unsafe cell, failing to provide appropriate mental health treatment, failing to recognize his signs of distress and requests for help, failing to adopt the minimum policies, procedures, and training necessary to ensure identification or response to an inmate in crisis, ignoring the duties of medical staff to treat and monitor Mr. Masterson's altered mental status, failing to complete adequate welfare checks, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

153.    Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Mr. Masterson, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

**COMPLAINT**

154.   Together, these Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Mr. Masterson sustained injuries and damages resulting in injuries and damages to Plaintiffs as alleged herein.

155.   The negligent conduct of Defendants was committed within the course and scope of their employment

156.   As a direct and proximate result of Defendants' failures, Mr. Masterson endured pain, suffering, physical injury and emotional distress prior to his death as alleged herein.

157.   Mr. Masterson also suffered a wholly preventable death, and Plaintiffs incurred funeral and burial expense. Plaintiffs have also suffered and will continue to suffer emotional distress, pain, suffering, medical treatment, past and future loss of earnings and benefits, loss of familial relations, loss of society, love, moral support, companionship, comfort, care, assistance, protection, affection, household services, financial support and care to the extent recoverable.

158.   The aforementioned acts of the individual Defendants were conducted with conscious disregard for the safety of Plaintiffs and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

159.   Plaintiffs have sustained a loss of interest on the value of all damages from the date they were incurred to the present and said loss will continue into the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.   For general damages according to proof;

2.   For special damages according to proof;

3.   For compensatory damages according to proof;

4.   For punitive and exemplary damages against each individually named Defendant, where available, according to proof;

5.   For funeral and burial expenses, and incidental according to proof;

6.   For damages for loss of earning capacity and loss of earnings, according to proof;

7.   For damages for other economic losses, according to proof;

**COMPLAINT**

8.  For interest on general and special damages, as permitted by law;

9.  For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

10. For restitution as the court deems just and proper;

11. For such other relief as the Court may deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury in this action.

Dated:     March 28, 2019                **ARIAS SANGUINETTI WANG & TORRIJOS LLP**

By:  /s/ Elise R. Sanguinetti
ELISE R. SANGUINETTI
JAMIE G. GOLDSTEIN
Attorneys for Plaintiffs

COMPLAINT